UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEIPER LLC,

        Plaintiff,

v.

INTIER AUTOMOTIVE INC. d/b/a
INNOVATECH SEATING SYSTEMS,

        Defendant.

_____/

Case No. 08-12096

Honorable Nancy G. Edmunds


**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [64]**


This contract dispute comes before the Court on Defendant Intier Automotive Inc.
("Intier")'s motion for summary judgment. The Court has diversity jurisdiction over this
matter. Plaintiff Keiper LLC, a Tier II manufacturer, brings this action against Defendant
Intier, a Tier I manufacturer. Keiper alleges that Defendant breached their purchase
contracts by failing to pay the full amount owed. Keiper also seeks a judgment declaring
that it did not breach any of the warranties it owed Intier under their contracts. For the
reasons stated below, Defendant's motion for summary judgment is GRANTED.

**I.  Facts**

    **A.  Parties' Relationship and Purchase Contracts**

Defendant Intier is a Tier I automotive seating supplier to several OEMs, including
Chrysler. In this capacity, Intier supplied completed seats to Chrysler for Chrysler's CS
vehicle program, commonly known as the Chrysler Pacifica crossover vehicle. Intier, in

turn, contracted with its Tier II supplier, Plaintiff Keiper, to supply front seat Recliner Systems ("Recliners")[1] for incorporation into the Chrysler Pacifica vehicle. These Recliners had power seat adjustments; they reclined or inclined by means of an electric motor. That motor was supplied to Keiper by its supplier, Valeo.

Intier and Chrysler provided Keiper with specific design requirements and performance specifications, and the product it supplied to Intier was tested and found to be in accordance with the specifications provided by both. (Compl. at ¶ 5; Pl.'s Ex. C, Brassat Aff. at ¶¶ 5-6.) Intier purchased the Recliners from Keiper, integrated them into its seat frame, added cushioning, cover and trim, and shipped the completed seats to Chrysler for incorporation into its Pacifica vehicles.

Intier issued Keiper a blanket purchase order, No. 001206, for the Recliners. The initial Purchase Order was issued on September 7, 2004, and revised on the following dates: February 15 and 16, 2005; April 1, 2005; April 24, 2006; May 3, 2006; and March 9, 2007. (Def.'s Ex. 1, Purchase Orders.) The first four Purchase Orders incorporate Intier's "1998 Terms and Conditions" (Def.'s Ex. 2); the remaining three incorporate Intier's "September 2005 Terms and Conditions." (Def.'s Ex. 3).

In the 1998 Terms and Conditions, express warranties regarding goods are provided in Paragraph 13:

> Seller expressly warrants that all Goods and Services, including without limitation any special tools, dies, gigs, fixtures, patterns, machinery and equipment, obtained at Buyer's expenses for the performance of that Order and/or which are to be the property of Buyer, shall conform to all drawings, specifications, samples and other descriptions furnished, specified or adopted by Buyer, shall

---

[1] The system is comprised of two front seat recliners, a connecting rod, motors, and a potentiometer shipped unassembled for incorporation into the seat.

be merchantable, free from any defects in material and workmanship and free of all liens, claims and encumbrances whatsoever. <u>If Seller knows, or has reason to know, the particular purpose for which Buyer intends to use the Goods or Services, Seller warrants that such Goods or Services shall be fit and sufficient for such particular purpose.</u> Seller's warranties are available to, and for the benefit of, Buyer, Buyer's Affiliates and their respective successors, assigns and customers and users of products containing Goods or Services. <u>These warranties shall be in addition to all other warranties available under applicable law.</u> <u>Seller shall indemnify</u> and save <u>Buyer</u>, Buyer's Affiliates and their respective successors and assigns <u>harmless</u> <u>from any breach of these warranties</u> and, for greater certainty, no limitations on Buyer's remedies in Seller's documents, if any, shall operate to reduce this indemnification. <u>Seller shall also indemnify Buyer from and against all liability or damages (including any lost profits, recall costs or other consequential damages) imposed upon Buyer resulting from acts or omissions of Seller in respect of Goods</u> or Services.

(Def.'s Ex. 2, ¶ 13 (emphasis added).) As highlighted above, the 1998 Terms and Conditions also provide that the Seller shall indemnify the Buyer from any breach of Seller's warranties.

Paragraph 13 of the September 2005 Terms and Conditions provides similar warranties:

(a) Seller expressly warrants that the Goods and Services, including any special tools, dies, jigs, fixtures, patterns, machinery and equipment, that are obtained at Buyer's expense for the performance of this Order and/or are or become the property of Buyer . . . shall: (i) conform to all drawings, specifications, samples and other descriptions furnished, specified or adopted by Buyer; (ii) comply with all applicable laws, regulations, rules, codes and standards of the jurisdictions in which the Goods . . ., and the products containing the Goods . . ., are to be sold; (iii) be merchantable; (iv) be free from any defects in design, to the extent furnished by Seller or any of its subcontractors or suppliers, <u>even if the design has been approved by Buyer;</u> (v) be free from any defects in materials and workmanship; (vi) <u>be fit, sufficient and suitable for the particular purpose for which Buyer intends to use the Goods . . . , including the specified performance in the component, system, subsystem and vehicle location and the environment in which they are or may reasonably be expected to perform.</u> . . . <u>For the purposes of clause (vi) above, Seller acknowledges that Seller knows the particular purpose for which Buyer intends to use the Goods.</u> . . .

(Def.'s Ex. 3 at ¶ 13(a) (emphasis added).)  Paragraph 13(b) further provides that the above-quoted "Seller's Warranties shall be in addition to all other warranties available under applicable law." (*Id.* at ¶ 13(b).)  These Seller's Warranties also extend to Intier's OEM customer, Chrysler. (*Id.*)

Under these 2005 Terms and Conditions, Keiper—the Seller—also agreed to indemnify Intier—the Buyer—and Intier's OEM customer—Chrysler—for losses resulting from any breach of its Seller's Warranties:

> (c)  Seller shall indemnify and hold Buyer, its subsidiaries and affiliates, and their respective successors, assigns, representatives, employees and agents, <u>and the OEM Customer</u> harmless from and against all liabilities, claims, demands, losses, costs, damages and expenses of any nature or kind (including consequential and special damages, . . . recall or other customer field service action costs . . . ) <u>arising from or as a result of:  (i) any breach of the Seller's Warranties</u>; and (ii) any other acts, omissions or negligence of Seller or of any of its subcontracts or suppliers in connection with Seller's performance of its obligations under this Order.  No limitations on Buyer's rights or remedies in any of Seller's documents shall operate to reduce or exclude such indemnification.

(*Id.* at ¶ 13(c) (emphasis added).)  The 2005 Terms and Conditions further specify that these indemnification costs may be set off against amounts otherwise due and owing from the Buyer, Intier, to the Seller, Keiper:

> In addition to any right of set-off or recoupment provided by law, all amounts due to Seller and its subsidiaries and affiliates shall be considered net of indebtedness or obligations of Seller and its subsidiaries and affiliates to Buyer and its subsidiaries and affiliates, and Buyer and its subsidiaries and affiliates may set-off against or recoup from any amounts due or to become due from Seller and its subsidiaries and affiliates to Buyer and its subsidiaries and affiliates however and whenever arising.  Buyer may do so without notice to Seller or its subsidiaries or affiliates.  If any obligations of Seller . . . to Buyer . . . . are disputed, contingent or unliquidated, Buyer may defer payment of amounts due until such obligations are resolved.

(*Id.* at ¶ 10.)

**B.  Warranty Returns and Debits**

4

In April 2005, shortly after production began, Chrysler Pacifica owners began to experience a warranty problem with the front driver and passenger seats. Specifically, the motors in the power recliners stopped working; they lost the ability to incline or recline. (Def.'s Ex. 4, D. Brassat Dep. at 20; Ex. 5, Keiper "7-Step Corrective Action Plan Form" at ¶ 1.)

A June 23, 2006 "7-Step Corrective Action Plan Form," prepared by Keiper states that the "Date Root Cause Identified" was August 31, 2005. This "7-Step Corrective Action Plan" reported that 40 front seat recliner motors, identified as "Valeo 'level 10' motors," had been returned "under warranty with inoperative or 'binding' condition." (*Id.*) Keiper was able to duplicate the "reported malfunction," and discovered that "[m]ost motors showed deformation in one or two of the teeth of the yellow intermediate gear and in one or two of the teeth of the large output gear of the gearboxes of the motors. Some motors had loose metal intermediate gear axles." (*Id.* at ¶ 2.) It determined what caused the deformations: "The yellow intermediate gear tooth overriding the output gear teeth caused the deformations and is the failure mode." (*Id.*) The Keiper report goes on, under paragraph 3 titled "Root Cause," to conclude that "All motors operate after disassembly, freeing of any jammed gears, and re-assembly without replacing the gearbox cover, and without replacing gears. Thus the problem is in the gearbox." (*Id.* at ¶ 3.) The gears and gearboxes were parts contained in the Recliners supplied by Keiper to Intier.

The "Root Cause" section of the Keiper Report observes that "[p]roduction motors fitted with output gears 0.3 mm larger than current production design survived more than twice the number of cycles of the special stall test than the current production design." (*Id.*) Thus, Keiper's investigation of the "root cause" revealed that when larger output gears were

used, the motor performed better. In keeping with this "root cause" determination, the Keiper Report's section titled "Permanent Action" concludes that "The diameter of the output gear" should be "increased 0.3 mm from the 47.6 mm to 47.9 mm;" and it's section titled "Prevention" provides that "The new output gear design with increase of 0.3 mm to the gear tooth tip OD will improve the capability of the motor and thus reduce warranty occurrences." (*Id.* at ¶¶ 4 and 7.) There is no mention in these "root cause," "permanent action," or "prevention" sections about the seat back angle, the full forward stop position of the seat, or any "external" factor as a cause or potential cause of the Keiper Recliners' failures.

A December 14, 2006 "Issue Report" prepared by Intier provides the following information about this same warranty issue, identified as "CS Power Seat Back Recliner Motor Inoperative or Binding." (Pl.'s Ex. N at 1.) The problem was first discovered on July 19, 2005 as a result of warranty returns. (*Id.* at Step 1.) Intier noted that the part supplier, Keiper, "did not find violation of any existing specification or a deviation from normal manufacturing processes that would prompt containment." (*Id.* at Step 2.) Rather, "[t]his was a design refinement issue." (*Id.*) A "root cause" analysis was completed on December 12, 2006. Under "Root Cause Analysis, Issue Solver," it is reported that "Keiper found that the current revision 10 level motor design was within all specifications, but could be made more robust with design improvements." (*Id.* at Step 3.) Under "Root Cause Analysis Options, Issue Manager," in contrast, it is reported that "Root Cause Analysis verifies that the component or process is non-conforming to the specifications." (*Id.*) Permanent corrective actions were addressed. It was reported that Keiper had increased the diameter of the output gear in the Recliner motor, and the change "was effective at [Intier] with

6

shipments on June 7, 2006."  (*Id.* at Step 4.)  It was further reported that "[t]he motor with the larger output diameter gear has successfully completed durability tests of 3 motors, comparing durability of the new design to the previous. . . ."  (*Id.* at Step 5 (emphasis added).)  The report concluded that "[t]he new output gear design with increase of 0.3 mm to the gear tooth tip OD will improve the capability of the motor and thus reduce warranty occurrences.  (*Id.* at Step 6 (emphasis added).)  Under a section titled "Lessons Learned," the following observation is made:  "This motor design was used on multiple car lines without field issues and met all established specifications.  The unique Pacifica seating environment contributes to a higher than desired mortality.  DaimlerChrysler and the suppliers should jointly identify special vehicle environments that demand additional robustness."  (*Id.* at Step 8.)

On March 5, 2008, after changes had been made to the Keiper Recliner motor, Chrysler's engineer and warranty executive, Gregg Pochmara, observed that "fault" questions remained:

> At this point, I think there is agreement that the warranty failures were caused by an unexpected "hard stop" condition in the full up position.
>
> However, the argument is now about who is "at fault" for the unexpected failures. Is Chrysler's "PF" to blame?  Is Chrysler/Intier to blame for designing the recliner with the "up" stop only 4 degrees forward of design?  Is Keiper at fault for not knowing about this design failure in their DFMEA and then giving direction on where to position the "up" stop?

(Pl.'s Ex. M, 3/5/08 email re: CS Keiper Recliner.)

Based on the warranty returns, Chrysler has or will debit Intier approximately $900,000 as of December 4, 2009.  The amount Chrysler will debit will increase because the warranty period has not yet run on all Pacificas with the subject Recliners.  Defendant

Intier has, in turn, debited Keiper approximately $860,000 as a set-off against current and future debits from Chrysler. (Def.'s Ex. 6, T. Lendzion Dep. at 45-46.) Keiper comes up with a much larger amount. It claims that Intier has deducted $115,722.85 from amounts Intier owes it for Recliners. Keiper also claims that Intier is withholding $843,915.37 owed to Keiper for Recliners as a "reserve" against future warranty claims. (Pl.'s Br. at 10, citing Pl.'s Exs. A and L.)

## II.    Summary Judgment Standard of Review

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). When the moving party has met its burden under rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.    Analysis

This matter is now before the Court on Defendant Intier's motion for summary judgment. Intier argues that no genuine issue of material fact exists on the question whether it breached its contract with Keiper; it did not. Keiper argues otherwise.

Keiper's suit is based upon Intier's withholding of warranty costs from amounts otherwise due Keiper. As discussed above, in April 19, 2005, 40 front seat Recliner motors that Keiper sold to Intier and that were ultimately incorporated into the Chrysler Pacifica had been returned under warranty. Keiper conceded in writing that the "root cause" of the front seat Recliner problem could be found in the gearbox it produced, recommended a permanent design change to its part, and further acknowledged that "[t]he new output gear design with [an] increase of 0.3 mm to the gear tooth tip OD will improve capability of the motor and thus reduce warranty occurrences." (Def.'s Ex. 5, Keiper 7-Step Corrective Action Plan at ¶¶ 4, 6-7.) In light of these party admissions, Intier argues that Keiper breached its warranties that (1) its part would be free from any design defects, even if the design had been approved by Buyer Intier; and (2) the part would be fit for its intended use. Because Keiper breached that Seller's Warranty, Intier argues, the indemnification and off-set provisions of the parties' contract were triggered, thus justifying Intier's withholding of warranty costs from amounts otherwise due to Keiper. Thus, Intier concludes, based on the plain language of the parties' contract and Keiper's undisputed written admission, Keiper cannot prove that Intier breached the parties' contract with its warranty return debits. Rather, it was Keiper that breached the Seller's Warranties of their contract. Accordingly, both of Keiper's claims — breach of contract and declaratory judgment — fail.

Keiper's Director of Engineering, Dirk Brassat, attests to the following. Intier and Chrysler provided Keiper with specific design requirements and performance specifications for the Recliners it sold to Intier. (Pl.'s Ex. C, Brassat Aff. ¶ 5.) Keiper was responsible for the design of the brackets that attached the core Recliner components to the Intier-designed seats. (*Id.*) Intier, however, provided input into the design of the brackets. (*Id.*) Prior to delivery, Keiper tested the Recliners in accordance with mutually agreed Recliner specifications developed according to the specific standards provided by Chrysler and/or Intier. (*Id.* at ¶ 6.)

After the Chrysler Pacifica was made available to the public, there were reports that Keiper's Recliner motor gears were failing. (*Id.* at ¶ 7.) While investigating the "root cause" of the motor gear problem, Keiper implemented changes to its Recliners by using motors with more robust (larger) gears as one of the counter measures to the gear failures. (*Id.*) These changes were referred to as changes from the Revision 8 to the Revision 10, and eventually Revision 10a motors. (*Id.*)

Brassat attests that Keiper considered the changes to its Recliner motors "as one of the counter-measures to the cause of the failures which it identified in August of 2005 as the design position of the seatback's forward stop for the recliner." (*Id.*) In other words, the motor changes were part of the cure to a problem caused by a designed forward stop position of the seatback, i.e., the maximum forward range of motion. Keiper disagrees with Intier's assessment that the "root cause" of the motor failures was the lack of a sufficiently robust gear in the Recliner motor because it produces millions of recliner assemblies for other U.S. and European vehicles that use the Revision 8, 10 and 10a motors without

similar failures.  (*Id.* at ¶ 9.)   Keiper arrives at this conclusion because its testing and analysis established that, <u>while the change to the more robust gear motor served as a counter-measure prolonging the failures</u>, the failure <u>could be</u> replicated <u>if</u> these gears were loaded against <u>the forward stop under high heat conditions</u>.  Moreover, Keiper discovered that "the risk is virtually eliminated <u>if the forward stop is moved to a non-seatable/non-driveable position</u>."  (*Id.* at ¶ 10 (emphasis added).)  Mr. Brassat concludes by speculating that "Intier <u>may have caused, or further exacerbated, the motor failures</u> by shipping the completed seats in the full forward position. . . ."  (*Id.* at ¶ 11 (emphasis added).)

In its Response, Keiper concedes that it was aware of the seatback's range of motion. (Resp. at 6.)  Nonetheless, Keiper argues that it did not breach either its design or its fitness-for-intended-use Seller's Warranties because Intier failed to (1) tell it specifically "how that range of motion would operate within the overall Intier seat frame design," (2) provide it with information about Intier's "computerized range of motion tests," or (3) tell it that "the Recliner would be placed and left in the full forward position when the seatbacks were shipped to Chrysler."  (*Id.*)

Keiper does not deny that some of the Recliner motors it supplied to Intier failed. (Pl.'s Resp. at 3.)  It concedes that Keiper was responsible for the design of the Recliner's core mechanism and the motor.  (Pl.'s Resp. at 5.)  Keiper also concedes that it was aware of the seatback's range of motion.  (Resp. at 6.)  It contends, however, that it is Intier's burden to prove that Keiper breached any of its Seller's Warranties, and Intier has failed to satisfy its burden.  Specifically, Keiper argues that Intier cannot meet that burden because (1) it met all of the required design, engineering, manufacturing, and testing

specifications for the Recliners; (2) at the time of the sale, it was unaware of the Recliner's specific orientation within the overall seat frame design and was unaware of Intier's and Chrysler's post-delivery testing and shipping in the "full-forward" position that unduly stressed the motor gears; (3) its Recliner was fit for its particular purpose as evidenced by the fact that it was successfully incorporated into other vehicle models without motor failures; and (4) it was Intier's overall seat design combined with its testing and shipping practices that caused the warranty problems as evidenced by the fact that the same model seats also experienced motor failures in the power lumbar systems that were manufactured and sold to Intier by another supplier.

In sum, Keiper argues that summary judgment is inappropriate because two key questions of fact remain for trial: (1) who was responsible for the design that caused the gear failure; and (2) were Keiper's Recliners fit for their intended use in the Chrysler Pacifica seat. Keiper further argues that Intier's interpretation of the warranty terms at issue here are wrong as a matter of law.

This Court begins its analysis with a discussion of what law governs this contract dispute.

### A. Applicable Law

Both the 1998 and 2005 Terms and Conditions at issue here have a "choice-of-law" provision. It provides that any disputes arising out of the parties' purchase orders are to be governed by Ontario law. As to contractual choice-of-law provisions, "Michigan has adopted the approach set forth in the Restatement (Second) of Conflicts of Laws. According to this approach, a contractual choice of law provision will be binding unless

either: '(a) [t]he chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chose state in the determination of the particular issue and which, under the rule of [§] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'" *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 739 (6th Cir. 1999) (quoting Restatement (Second) of Conflict of Laws, § 187(2)) (internal case citation omitted). *Accord Hardy v. Reynolds & Reynolds Co.*, 311 F. App'x 759, 761 (6th Cir. 2009) (quoting the Restatement and observing that "Michigan state courts generally favor enforcing contractual provisions regarding the choice of law").

It does not appear that either exception would apply here. Thus, it is proper to interpret the subject Purchase Orders, including their Terms and Conditions, under Ontario law. Keiper and Intier, however, agree that there is no material difference between Ontario contract law and Michigan contract law and thus cite both interchangeably. (Pl.'s Resp. at 13, n.3.)

Having determined what law applies to this controversy, the Court now considers Keiper's argument about the burden of proof.

## B. Keiper Bears the Burden of Proof on its Breach of Contract and Declaratory Judgment Claims

This Court first addresses Keiper's improper attempt to shift the burden of proof of its claims to Defendant. Defendant Intier's motion does not argue that it is entitled to summary judgment on its affirmative defenses. Rather, it argues that it is entitled to summary

judgment on the claims Plaintiff Keiper asserts in its complaint. Keiper's complaint contains two causes of action — breach of contract and declaratory judgment — that are based on the same premise. Keiper claims that Intier breached the parties' contract by passing through warranty debits from Chrysler and deducting those warranty debits from amounts otherwise owed by Intier to Keiper. (Compl. ¶¶ 23-25.) Similarly, Keiper asks this Court to declare that Keiper has not breached its obligations under the parties' contract. This is related to its breach of contract claim against Intier because Intier cannot be found in breach for wrongfully withholding payments if Keiper breached its obligations under their contract. Thus, each of Plaintiff Keiper's claims is based on the premise that it is Intier, not Keiper, that breached their contract.

"Under Michigan law,[2] the elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury." *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005). The second and third elements of Keiper's *prima facie* case require that Keiper prove that it fully performed its obligations under its contract with Intier, thereby triggering its right to be paid. Without that proof, Keiper cannot succeed on either of its causes of action. Accordingly, the burden is on Keiper to prove that it did not breach its Sellers Warranties, that it was not obligated to indemnify Intier for warranty costs, and that the setoff provisions of its contract with Intier were not triggered.

---

[2]Keiper does not argue that Ontario law is different.

The Court now considers whether Keiper breached its design or fitness warranties. It begins with an examination of the terms and conditions applicable to the Keiper Recliner purchase orders.

## C. Warranty Obligations

Intier maintains that, while the language of the 1998 and 2005 warranty provisions may be slightly different, the effect of the warranty provisions is the same: Keiper failed to full its warranty obligations. This argument requires an examination of the 1998 and 2005 warranty provisions — first, to determine if their terms are different; and second, to determine whether those differences are significant to the issues presented here.[3] These questions are ones of contract interpretations; and so, the Court begins with a discussion of the legal principles that guide its analysis.

### 1. Legal Principles

The issues presented here concern matters of contract interpretation; and thus, general rules of contract interpretation apply. The court must first determine whether the contract language at issue is ambiguous. If found to be unambiguous, the court must then construe the relevant terms of the contract.

The question of whether a contract is ambiguous is a question of law for the court. *Steinmetz Elec. Contractors v. Local Union No. 58*, 517 F. Supp. 428, 432 (E.D. Mich.

_____

[3]Contrary to Keiper's arguments here, Intier's earlier filings are sufficient to establish that the 1998 Terms and Conditions discussed here were in fact those on the reverse side of the 9/4/04 initial blanket purchase order and those purchase orders revised before the September 2005 Terms and Conditions took effect. (*See* Toby White 10/28/09 Decl.) Likewise, Intier has established that the 2005 Terms and Conditions discussed here were in fact those that governed the post-September 2005 purchase orders.

1981); *Mayer v. Auto-Owners Ins. Co.*, 338 N.W.2d 407, 409 (Mich. Ct. App. 1983). Construction of a contract is also a question of law for the court. *Fragner v. American Community Mut. Ins. Co.*, 502 N.W.2d 350, 352 (Mich. Ct. App. 1993); *Petovello v. Murray*, 362 N.W.2d 857, 858 (Mich. Ct. App. 1984).

A contract which admits of but one interpretation is unambiguous. *Fragner*, 502 N.W.2d at 352. In contrast, a contract provision is ambiguous if it is capable of two or more constructions, both of which are reasonable. *Petovello*, 362 N.W.2d at 858. If a contract is clear and unambiguous, the court must enforce the contract as written, according to its plain meaning, *Clevenger v. Allstate Insurance Co.*, 505 N.W.2d 553, 557 (Mich. 1993), without looking to extrinsic evidence. *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 396 n. 6 (Mich. 1991). It is improper for the court to ignore the plain meaning of the policy's language in favor of a technical or strained construction. *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989). *See also Pizza Pizza Ltd. v. Gillespie* (1990), 45 C.P.C. (2d) 168, 75 O.R. (2d) 225 (Ont. C.A.), at ¶¶ 46-50 (observing that construction of unambiguous contract language presents a question of law for the court); *Eli Lilly & Co. v. Novopharm Ltd.*, (1998), 2 S.C.R. 129, 161 D.L.R. (4th) 1, ¶¶ 57-58 (same); *Venture Capital USA, Inc. v. Yorkton Securities, Inc.* (2005), 197 O.A.C. 264, 75 O.R. (3d) 325 (Ont. C.A.), ¶ 26 (observing that courts are to construe contract language by giving effect to the parties' intent as expressed in the plain language of their written agreement).

Because the terms and conditions at issue here admit of but one interpretation, the Court finds them to be unambiguous. It now interprets and compares the relevant terms, giving them their plain meaning.

### 2. Comparisons of Contract Terms

The original purchase order for the Keiper-designed Recliners was issued on February 15, 2005. That purchase order was revised six times. For the February 15 and 16, 2005 and April 1, 2005 purchase orders, the 1998 Terms and Conditions were in effect. Of particular interest here, the April 1, 2005 revised purchase order is for "motor-recliner servi[ce]" and under its "Reason for Change" section, states "[a]dd front seat recliner motor for service, revision 10 motor with grey connector as per revision 8 assembly." (Def.'s Ex. 1.) The change effective date was listed as April 1, 2005. (*Id.*)

From April 24, 2006 forward, the 2005 Terms and Conditions applied. Of particular interest here, the April 24, 2006 revised purchase order involves the "motor-front recliner." (Def.'s Ex. 1.) Under "Reason for Change," the purchase order states, "increase output gear diameter to improve gear mesh of internal components." (*Id.*) The effective date for the change was listed as April 24, 2006. (*Id.*)

A comparison of the relevant warranty, indemnification, and set-off provisions is as follows.

Design Warranties

1998 Terms and Conditions:

"Seller expressly warrants that all Goods . . . shall be . . . free from any defects in material and workmanship. . . ." (Def.'s Ex. 2, ¶ 13.)

2005 Terms and Conditions:

"Seller expressly warrants that the Goods . . . shall . . . be free for any defects in design, to the extent furnished by Seller or any of its subcontractors or suppliers, even if the design has been approved by Buyer. . . ."  (Def.'s Ex. 3, ¶ 13(a).)

Fitness for Particular Purpose

1998 Terms and Conditions:

"If Seller knows, or has reason to know, the particular purpose for which Buyer intends to use the Goods . . ., Seller warrants that such Goods or Services shall be fit and sufficient for such particular purpose. . . .  These warranties shall be in addition to all other warranties available under applicable law."  (Def.'s Ex. 2, ¶ 13.)

2005 Terms and Conditions:

"Seller expressly warrants that the Goods . . . . shall . . . be fit, sufficient and suitable for the particular purpose for which Buyer intends to use the Goods . . . including the specified performance in the component, system, subsystem and vehicle location and the environment in which they are or may reasonably be expected to perform . . . .  For the purposes of [this] clause . . . , Seller acknowledges that Seller knows the particular purpose for which Buyer intends to use the Goods . . . ."  (Def.'s Ex. 3, ¶ 13(a) (emphasis added).)

Indemnification

1998 Terms and Conditions:

"Seller shall indemnify and save Buyer . . . harmless from any breach of these warranties . . . .  Seller shall also indemnify Buyer from and against all liability or damages (including any . . . recall costs or other consequential damages) imposed upon Buyer resulting from acts or omissions of Seller in respect of Goods or Services."  (Def.'s Ex. 2, ¶ 13.)

2005 Terms and Conditions:

"Seller shall indemnify and hold Buyer . . . and the OEM Customer harmless from and against all liabilities, claims, demands, losses, costs, damages and expenses of any nature or kind (including consequential and special damages, . . . recall or other customer field service action costs . . . ) arising from or as a result of . . . any breach of the Seller's Warranties. . . ."  (Def.'s Ex. 3, ¶ 13(c).)

Set-Off

1998 Terms and Conditions:

"In addition to any right of set-off provided by law, all amounts due or to become due to Seller from Buyer shall be considered net of indebtedness of Seller to Buyer . . . and Buyer may deduct or set off any such indebtedness from any amounts due or to become due to Seller from Buyer, regardless of whether such indebtedness and amount would be considered, in law, to be mutual."  (Def.'s Ex. 2, ¶ 10.)

2005 Terms and Conditions:

"In addition to any right of set-off or recoupment provided by law, all amounts due to Seller . . . shall be considered net of indebtedness or obligations of Seller . . . to Buyer . . . and Buyer . . . may set-off against or recoup from any amounts due or to become due from Seller . . . to Buyer . . . however and whenever arising.  Buyer may do so without notice to Seller or its subsidiaries or affiliates. If any obligations of Seller . . . to Buyer . . . are disputed, contingent or unliquidated, Buyer may defer payment of amounts due until such obligations are resolved.  (Def.'s Ex. 3, ¶ 10.)

Comparing the above provisions, this Court concludes that the indemnification terms are essentially the same.  The set-off provisions are substantially similar; the key difference between the two is that the 2005 Terms and Conditions expressly provide that "Buyer may defer payment of amounts due until such obligations are resolved." (*Id.* (emphasis added).) There are, however, some significant differences in the warranty provisions.

First, the express warranty against design defects that is present in the 2005 Terms and Conditions is absent from the 1998 Terms and Conditions. Second, as to the "fitness for a particular purpose" warranty, the 1998 Terms and Conditions provide that if the Seller "knows, or has reason to know, the particular purpose for which Buyer intends to use the Goods," then the Seller warrants that such Goods "shall be fit and sufficient for such particular purpose." (Def.'s Ex. 2, ¶ 13.) Thus, to trigger this warranty provision, there must be evidence that the Seller knew or had reason to know of the Buyer's intended use for the Goods. In contrast, under the 2005 Terms and Conditions, the Seller expressly "acknowledges" that it "knows the particular purpose for which Buyer intends to use the Goods . . . ." (Def.'s Ex. 3, ¶ 13(a).) The Court now addresses this warranty of fitness for a particular purpose.

The 2005 Terms and Conditions contain an express acknowledgment that Keiper did, in fact, know the particular purpose for which its Recliners would be used. Keiper's attempts to avoid this express acknowledgment fail. Intier presents undisputed evidence that (1) the warranty returns at issue here were for failures that occurred during normal customer use (Def.'s Ex. 5, Keiper 6/23/06 7-Step Corrective Action Plan; Pl.'s Ex. N, Intier "Issue Detail Report"); (2) Keiper was aware of the range of motion within which its Recliners were intended to perform and was aware of the intended forward and rear stops (Def.'s Ex. 8, Keiper Recliner design drawings; S. Somasundaram Dep. at 122-23); and (3) Keiper's investigation of the "root cause" of the warranty returns revealed that (a) the problem was in its gearbox, and (b) when larger output gears were used, its Recliner motors performed better, and thus concluded that a "new output gear design with [an]

increase of 0.3 mm to the gear tooth tip OD will improve the capability of the motor and thus reduce warranty occurrences (Def.'s Ex. 5 at ¶ 7).  In light of this evidence, Keiper cannot avoid its express acknowledgment that it knew the particular purpose for which its Recliners were to be used.  Likewise, Keiper cannot avoid the fact that it breached the express warranty of fitness for a particular purpose in the 2005 Terms and Conditions thus triggering the indemnification and set-off provisions.

The undisputed evidence discussed above also shows that Keiper knew, or had reason to know, the particular purpose for which Intier intended to use its Recliners and that it breached the warranty of fitness for a particular purpose in the 1998 Terms and Conditions.  Keiper concedes that it was responsible for the design of the Recliner's core mechanism and the motor.  (Pl.'s Resp. at 5; S. Somasundaram Dep. at 46-48.)  Keiper does not deny that some of the Recliner motors it supplied to Intier failed.  (Pl.'s Resp. at 3.)  As discussed above, Keiper admitted in its own investigative report that the size of the gearbox in the motor of its Recliners was the "root cause" of the warranty returns.  There is no mention in that report that the overall design of the Pacifica seat, as opposed to the design of its Recliners, caused its Recliner motors to lose the ability to recline while in use by Pacifica customers.  There is no mention that the full forward stop angle of the seat during testing, driving, or shipping was the "root cause" of the gearbox failure or even a potential cause.  Rather, Keiper's internal investigative report concludes that the gears in its Recliner motor simply were not robust enough to perform their intended function.

Keiper also acknowledges that it was aware that the front seat recliners were intended to recline within a particular range of motion.  (Pl.'s Resp. at 23.)  Keiper was not only

aware of the range of motion within which its Recliners were intended to perform; it was also aware of the Recliners' intended forward and rear stops. (Def.'s Ex. 8, Keiper Recliner design drawings; S. Somasundaram Dep. at 122-23; Pl.'s Resp. at 6.) Keiper does not and cannot deny that it was tasked to build and supply Recliners that were capable of operating within a specified range of motion. (Def.'s Ex. 8; S. Somasundaram Dep. at 46-48.) Thus, it is undisputed that Keiper knew that it was obligated to supply Intier with Recliners that would not break when placed at any angle within that specified range of motion. There is no argument or evidence that Keiper's Recliners failed because they were tested, shipped, driven, or kept in an angle that falls outside the range of motion specified in the Recliner drawings.

Moreover, because Keiper was admittedly a "design responsible supplier" with regard to its Recliners, it is the party that is to be held responsible for the integrity of that design. If Keiper had any concern that the "unique" design of the Pacifica seat, or that testing, shipping, driving, or storing the seats at a certain angle within the specified range of motion would affect the integrity of its Recliners, then it was obligated to raise those concerns at the design stage. Keiper presents no evidence that it did so. Likewise, Keiper presents no evidence that it requested and failed to receive additional information that it believed was necessary to properly develop its Recliners. In light of its own detailed Recliner drawing (Def.'s Ex. 8), Keiper cannot argue that it did not know, or have reason to know, the particular purpose for which its Recliners were intended. As evidenced from the drawing, Keiper's Recliners are complex mechanical and electrical systems comprised of multiple parts and components, manufactured to exacting tolerances, and designed to

operate in a specific seating environment. Keiper's Recliners were designed and manufactured with one intended purpose — to recline Chrysler Pacifica seats within the range of motion specified on the Keiper Recliner drawing. Keiper's evidence — that recliner motors it designed for other vehicles (that may have had a different range of motion or different forward and rear stops) did not result in similar warranty returns — does nothing to show that the Recliners it designed for the specific range of motion and intended forward and rear stops of the Chrysler Pacific were fit for their intended purpose.

Despite the admission in its June 23, 2006 investigative report, Keiper argues here that there it did not breach any warranty because other possible "root causes" exist. These arguments also fail. The plain language of the parties' contract clarifies that Keiper is financially responsible for warranty debits when one of its parts is not fit for its intended purpose and thus breaks and causes warranty returns.

Even if Keiper's alternative "root cause" theories were relevant, there is no evidence supporting them. First, as Keiper's engineers admitted, in most instances when the parts were returned to Keiper for warranty analysis, the Recliner itself was not provided — just the affected Recliner motor was given to the Chrysler dealer performing the warranty repair. (Brassat Dep. at 125.) By examining only the motor, it is not possible to do more than conclude that the gears were bound and inoperative. Second, even in those instances where both the Recliner and the Recliner motor were examined by Keiper, Keiper engineer Sukumar Somasundaram acknowledged that it was not possible to tell how long, if at all, the Recliner was driven or stored in the full forward stop position. (S. Somasundaram Dep.

at 112-13; Brassat Dep. at 131-32.) Third, Keiper mischaracterizes the remaining evidence it proffers in support of its alternative "root cause" arguments.

Contrary to Keiper's claims here (Pl.'s Resp. at 6), Rodney Dalgord testified that Intier shipped the completed seats to Chrysler after testing at 18 degrees rearward of vertical — not at the 15.9 degree full forward stop. (Dalgord Dep. at 28.) Contrary to Keiper's claims here (Pl.'s Resp. at 6), Keiper's Warranty Meeting Minutes dated February 18, 2008, report that a Chrysler engineer "put forward the discussion point that it was possible that Intier had shipped, since SOP, the complete seat, into Chrysler assembly in the full forward position and that it was further a possibility that no further cycling/actuation of the recliner occurred at Chrysler Assembly." (Pl.'s Ex. J, Warranty Minutes at 2 (emphasis added).) The notes also reported that "Chrysler speculated that the above-mentioned forward loading of the seat may induce 'pre-damage,' hence affecting the life cycle of the motor." (*Id.* (emphasis added).) There is no evidence that any of the events that Chrysler speculated about did in fact occur.

Keiper's mischaracterization of evidence continues. Contrary to Keiper's claims here (Resp. at 6), there is no discussion in the minutes of seats in the full forward position being subjected to prolonged periods of heat and other conditions. (*Id.*) Contrary to Keiper's claims that lumbar support motors –- supplied by a different Seller — in the Pacifica similarly failed because Intier tested and shipped those assemblies in the full forward stop position (Resp. at 9), Intier engineer Rodney Dalgord testified that there was no shipping position for the lumbar support — it could be "all the way in or all the way out." (R. Dalgord Dep. at 28.) Contrary to Keiper's claim (Resp. at 8) that "[i]n 2005, Intier advised Keiper

of a potential change to the seatback's forward stop position," the cited pages of Keiper employee Sukumar Somasundaram's deposition do not support or even address this claim. (S. Somasundaram Dep. at 102-03.)  Rather, Mr. Somasundaram testifies that it is in the third quarter of 2005 when Keiper began to believe that the forward stop position was "one of the root causes" of its part's failure because of Keiper's subsequent testing.  (*Id.* at 103.) Contrary to Keiper's claim (Resp. at 8) that "[a] very similar failure was also found in the Lumbar motor under identical conditions (full-forward stop position and under high heat)," the e-mails Keiper provides as supporting evidence do not contain a single sentence comparing Lumbar motor failures with Recliner motor failures.  (Pl.'s Exs. G and K, e-mails re: lumbar motor from supplier other than Keiper.)

Because Keiper breached its warranty of fitness for a particular purpose under both the 1998 and 2005 Terms and Conditions, Intier was entitled to deduct or set-off any amounts it had to pay or will pay for the warranty repairs from amounts it owes to Keiper for its Recliners.[4]  As to the claims asserted in Plaintiff's complaint, there is no genuine issue of material fact whether Intier breached the parties' contract when it withheld warranty debits from amounts otherwise payable to Keiper.  It did not.  Likewise, there is no genuine issue of material fact whether Keiper is entitled to a judgment declaring that it did not breach the warranty of fitness for a particular purpose.  It is not.

---

[4]In light of this Court's determination that Keiper breached its express warranty of fitness for a particular purpose under the 1998 and 2005 Terms and Conditions, there is no need to discuss Intier's claim that Keiper also breached its design defect warranties.

## IV. Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: March 22, 2010


I hereby certify that a copy of the foregoing document was served upon counsel of record on March 22, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager